## Supreme Court—General Term—Fifth Department.

*October*, 1885.

## PEOPLE *v.* UPTON.

OVERDRAFT OF ACCOUNT BY BANK OFFICER—CRIMINAL
TRIAL—MISJOINDER AND OMISSION TO STATE
VALUE—INDEFINITENESS OF DESCRIPTION
OF PROPERTY TAKEN—OBJECTIONS
RAISED BY DEMURRER—
WAIVER.

Upon the trial of an indictment under section 600, Penal Code, against an officer, &c., of a bank for knowingly overdrawing his account with such bank, either the prosecution or the defense may prove the actual state of the account at the time of the alleged offense, and defendant's guilt is to be determined thereby.

All errors in such account may be exposed and eliminated therefrom, and either side of the account may be surcharged by showing items of debt or credit overlooked and not entered therein.

It is beyond the province of the court, on the trial of an indictment for violation of the criminal law, to decide as to the truth or falsity on any pertinent question of fact raised on the trial, which the evidence tends to prove, however strong and convincing the evidence may appear in support of either side of the question. Though there be no real conflict in the evidence, there yet remains the question of credibility of the witnesses, upon which the jury must pass.

Where the indictment in separate counts charges the defendant, an officer of a bank, with the offense of overdrawing his account in different amounts and upon different dates, it is objectionable as charging more than one crime.

Such objection, *i. e.*, misjoinder, must be taken by demurrer, and is waived by appearance and plea of not guilty.

After judgment on a verdict of conviction, the court, at General Term, has no power to review the discretion of the Oyer and Terminer in refusing an application to withdraw a plea of not guilty and substitute a demurrer therefor.

Where the indictment against a bank officer for an overdraft of his account, &c., described the property obtained thereby as "the money, notes, drafts and funds of the bank," the indictment is bad for uncertainty but, such objection can only be raised by demurrer, and if not so raised, the averment will be held sufficient under the statute (§ 600) to show the commission of the crime and sustain a conviction therefor.

The indictment, in such a case, should set forth the value of the property acquired by the defendant by means of the overdraft, and the omission of such averment may be taken advantage of by demurrer, but a failure so to do is a waiver thereof.

Such a defect is formal, as neither the statutory offense nor its punishment is made to depend on the value of the money, &c., taken by the overdraft.

APPEAL from a judgment entered on a verdict ˙rendered at the Monroe County Oyer and Terminer, convicting the defendant, Charles E. Upton, of the crime of. knowingly overdrawing and thereby wrongfully obtaining money, notes, drafts and funds of such bank, he being at that time its president.

The indictment contained five counts, in each of which a separate and distinct offense was set forth, as having been committed on different days, in taking money in different sums. In the first count it is charged that the overdrawing was on the 4th day of December, 1882, in the sum of twenty-three thousand dollars; in the second, as occurring on the 11th of December, seven thousand dollars; in the third, on the 11th, in the sum of thirty thousand dollars; in the fourth, on the 18th, in the amount of eighteen thousand dollars; in the fifth, on the 19th, in the sum of twenty-three thousand six hundred and thirty-eight dollars and sixteen cents.

The first count was as follows: "The grand jury of the county of Monroe, by this indictment, accuse Charles E. Upton with the crime of knowingly overdrawing his account with the City Bank of Rochester; while he, said Upton, was an officer of said bank, committed as follows: The said Charles E. Upton, on the 4th day of December, 1882, at the city of Rochester, in this county, was an officer, to wit, the president of the City Bank of Rochester, which said 'The City Bank of Rochester' was then and there a corporation and bank, organized, existing and doing business as a bank, under and by virtue of the laws of the State of New York, and that he then had, and for a long time theretofore had had, and kept an account with said bank, in which he was credited with money deposited by him, and charged with money drawn out by him, and said Charles E. Upton being such officer and presi-

dent, did then and there, on the day last aforesaid, knowingly overdraw his said account at said bank, to wit, to the amount of twenty-three thousand dollars, and thereby wrongfully obtain the money, notes, drafts and funds of such bank, against the form of the statute in such case made and provided, and against the peace of the people of the State of New York, and their dignity."

The remaining counts of the indictment varied from the foregoing only as to the dates and amounts of the overdrafts.

The verdict as rendered and recorded, was in this form: "The jury find the defendant guilty of the misdemeanor charged in the third count in the indictment; that they find the defendant guilty of the misdemeanor charged in the fifth count of the indictment. And that they find the defendant not guilty of the charge in the first, second and fourth counts in the indictments." Defendant was sentenced to imprisonment in the Monroe county penitentiary for the period of six months.

The City Bank was organized under the State banking laws, and ceased to do business at the close of banking hours on the 19th of December, 1882, being then largely insolvent. The indictment was framed under section 600 of the Penal Code, which went into effect on the 1st day of December, 1882.

The further history of the case essential to the consideration of the questions decided, is set out in the opinion of the court.

*Martin W. Cooke* and *George Raines*, for the appellant.

*William F. Cogswell*, for the people, respondent.

BARKER, J.—The offense of which the defendant was convicted, was created and defined in section 600 of the Penal Code, which provides, namely: "An officer, agent, teller or clerk of any bank, banking association or saving bank, who knowingly overdraws his account with such bank, and thereby wrongfully obtains the money, notes or funds of such bank, is guilty of a misdemeanor."

The defendant was the president of the bank and its chief

VOL. IV—58

financial officer. The board of directors had confidence in his integrity and relied on his business capacity for a safe and prudent management of its affairs. The unfortunate history of the bank, as disclosed on the trial, justifies the conclusion that the defendant was well informed as to the condition of his account and that he was not ignorant of his own financial condition, and was also informed as to the sum of money he was using in his own business, drawn from the resources of the bank. At the time of the failure his actual indebtedness to the bank was over three hundred thousand dollars, on notes discounted, and in other forms of indebtedness, for the repayment of which the bank held some securities, not sufficient, however, to protect it from loss. The defendant kept an open current account with the bank, in which was entered items of debit and credit in the usual and customary way of keeping an account by banks with their customers, but the same had not been brought to an actual balance since September, 1881, up to the time of its failure. No other separate or distinct account was kept in his name, or otherwise, showing his dealings with the bank or the use he was making of its funds. The bank had and kept an account with the American Exchange National Bank of the city of New York, and acted as its eastern correspondent.

During the year 1882 the defendant speculated very largely in oil, buying and selling that article on the New York market. In conducting those operations he mingled his own funds with those of the City Bank by depositing the same to its credit and drawing out moneys on checks or drafts signed in his name as president of the City Bank. The items of debits and credits of this character, in this account, were numerous and the aggregate amount very large. Few if any of such items in this account were transferred to the individual account of the defendant kept on the books of the City Bank at its home office in the city of Rochester. The confusion, thus produced in that account, was not fully explained and cleared away on the trial by a proper separation of the items, so that the court or jury could say with any degree of accuracy which of the items related to the individual transactions of the defendant.

The prosecution, in support of the charge as set forth in the indictment, attempted to maintain that the defendant's account as kept on the books of the City Bank was, in fact, overdrawn on several occasions after the 1st day of December, 1882, when the statute creating the offense went into operation. This account if brought to a balance by footing the items actually entered therein as of the last day of November, would show an overdraft on that day of twenty-three thousand nine hundred and ten dollars and thirty-seven cents. Between that day and the 19th of December many items of credit were entered in the account, amounting in the aggregate to one hundred and eight thousand nine hundred and forty-four dollars and seventy-nine cents; and on the debit side the entries aggregated one hundred and eighteen thousand six hundred and seventy-four dollars and fifty-eight cents.

The people, in addition to proving the state of the account as it appeared on the books, sought to surcharge the debit side, and gave evidence tending to prove that on the day the bank failed, and on other days covering a period of some months prior thereto, the defendant had received in one form and another, moneys and funds of the bank which should have been charged up against him.

The defense disputed the charge of all overdrafts, after the 1st of December, and sought to meet and overcome the proofs on that subject, and insisted, on the other hand, that items of credits had been omitted from the account which should have been entered therein, and that on the last day of November the same was not in fact overdrawn, and it would have so appeared on the face of the account itself if all proper entries had been made therein.

Defendant also insisted that his actual indebtedness to the bank, whatever the same may have been at any time after the 1st day of December, was in loans of money represented by his notes and other commercial instruments, and no part of it consisted in an over-drawn account.

Upon these questions the evidence and circumstances bearing thereon were contradictory and conflicting, and the trial

judge seemed to entertain the same opinion, and gave the jury instructions in that view of the proofs.

In some respects the statute creates a new offense, although it may within the definition of the crimes there given, embrace what heretofore constituted embezzlement by the common law and under our statute. The chief purpose of the enactment, doubtless, is to secure a ready and easy conviction of bank offi-. cers and clerks, who, having access to the funds and securities of the bank, may misappropriate the same to their own use under the pretence of charging the amount or value thereof in their account with the bank, having no right to the same, in their usual business dealings with the bank. On the trial of an indictment charging a person, of the class of those mentioned in the statute, of the offence of overdrawing his account, either the prosecution or the defense may prove the actual state of the account, and the truth or falsity of the accusation is not to be determined alone by the state of the account as the same appears on the books by the entries made therein. All error in the account may be exposed and eliminated therefrom, with the view of arriving at the fact of an overdraft. So, for the same purpose, either side of the account may be surcharged by showing what items of credits or debits have been overlooked and not entered, if they be of such a character that on an adjustment of the account between the officer and the bank they should be properly entered therein. The learned trial judge gave this construction to the statute and charged the jury in substance:

"In the ordinary course of business with any man, his account appears upon the books of the bank. In the case of an officer of the bank who has charge to a greater or less extent of the business of the bank, not only does his account appear on the books of the bank, but the books of the bank are evidence of the state of his account. They are not conclusive evidence—they are evidence like any other fact of which he has knowledge and supervision, but they are subject to explanation on the part of the bank or of the officer, and because the books of the bank show that he has overdrawn, he is not necessarily precluded from showing that there is a mistake in

the books of the bank. Neither does it prevent the people from showing, either that he has more overdrawn than appears by the books of the bank, or that he is less overdrawn. It does not preclude either party from going back of the books and examining facts."

"We are here to look at the facts and see whether, as a matter of fact, taking into consideration not only what appears, but what actually exists, the defendant is guilty of the charge against him. You are not bound by theories, nor by any rules of abstract book-keeping, nor by the books, except so far as they represent the actual facts of the case." In this exposition of the statute, as applicable to the case in hand, we express our concurrence as a fair and reasonable rule by which the truth of the charge was to be tested by the jury.

The defendant, with a view of meeting the case which the people's proof tended to show, claimed that there had been omitted from the credits an item of twenty-five thousand dollars, which should have been entered in the account as to the 27th day of November, arising from the proceeds of the five Warner notes mentioned in the case. As matter of fact no item of credit was entered in the account relative to the avails of these notes, and the court ruled as a matter of law that defendant was not entitled to the credit for the reason, as the court said to the jury, "That the proceeds of these notes had been applied by the defendant on his other debts and obligations to the bank."

In this ruling we think there was error, in view of the evidence presented on that subject, and such direction may have prejudiced the defendant and produced the conviction on the third count, and perhaps also on the fifth. Upon a careful consideration of all the evidence, having in mind the theory and method by which the people sought to establish the defendant's guilt, the question whether the defendant was entitled to a credit in his account for the proceeds of the Warner notes, was one of fact for the jury and not one of law for the court. It appears to us as if the determination of the question must, in the end, turn upon the nature and effect which should be given to the conversation had between the defendant and some

of the other officers of the bank the day preceding the transaction, and what occurred when the Warner notes were procured by the defendant and turned over to the bank for its use.

If we understand the learned counsel for the people, he concedes that the ruling of the court, in excluding the credit, must be upheld, if it is sustained, upon the ground that the defendant did apply the avails of the notes to another purpose, and that the same was ·not intended to be credited to his account and could not be rightfully entered therein, and thus reduce the amount of his overdraft as it existed on the day of that transaction.

The overdraft, as it appeared on the last day of November by the entries actually made thereon, was twenty-three thousand nine hundred and ten dollars and thirty-seven cents. The first entry made therein after that day was on the 2d of December, of items of credit amounting to two thousand one hundred and seventeen dollars and fifty-one cents. The next entries were made on the 4th, and on that day the credits aggregated thirty-five thousand six hundred and eighty-two dollars and eighty-six cents, and the debits to the sum of thirty-six thousand five hundred and thirty-two dollars. The entire credits in December, up to and including the 11th, were fifty-four thousand two hundred and seventy-one dollars and thirty-three cents; the debits during the same period aggregated fifty-nine thousand five hundred and forty-seven dollars and forty-three cents. In the third count, and upon which the defendant was convicted, he is charged with making an overdraft of that day of thirty thousand dollars. From the entries in the account, as thus presented, the importance to the defendant of the credit claimed is clearly indicated.

The judge, in his instructions to the jury as to what would constitute an overdraft within the sense and meaning of the statute, referred to the condition of the account as it appeared on its face on the 30th day of November, and stated the amount of the overdraft as it thus appeared, and added: " Any deposits he made after the 30th of November, as before, would be put upon the account to his credit and they would go, not to give so much money to check out, but to decrease the over-

draft as it stood when the deposit was made, and he would have the right to draw out simply that balance after deducting the amount of the overdrafts from his deposits. So the only thing you need to do in reference to that, is to strike the balance on that day between the overdrafts and the deposits to his credit. If on that day he had drawn out more than he had deposited, there was an overdraft."

These instructions as to the mode and manner in which the jury should proceed in determining the question whether there was an overdraft or not at the times charged in the indictment, makes the question as to the condition of the account on the 30th of November one of vital importance to the defendant. If his account was then overdrawn in fact, as it appeared to be on its face, then the deposits made by the defendant on the 2d of December could not rightfully be drawn out at all, as they would go to reduce the overdraft as it existed on the 30th of November, the day before the law went into operation. It appears by the figures already given and from the other evidence, if a credit had been allowed to the defendant equal to the avails of the Warner notes, then the jury may have found, and from all the evidence would have been justified in finding, that the defendant's account was not overdrawn on the 11th of December.

The Warner notes were produced from the makers by the defendant for his accommodation, and bear date of the 27th of November, payable four months after date, to the order of the defendant, and by him indorsed in his individual capacity, and on that day were transferred to the bank for its use. They were immediately forwarded by the bank to Messrs. Lawrence, Potter & Co., a firm of bankers in Boston, and used by them to meet drafts drawn on their firm by the City Bank. On the day preceding this transaction the fact was made known to some of the directors and stockholders of the bank that the defendant was largely indebted to the bank, and that he was embarrassed in his financial affairs by reason of his heavy operations in buying and selling oil, and on that day an informal meeting of a portion of the directors was held, at which the defendant, the cashier and the attorney of the bank were

present, and the situation in which the bank was placed by the defendant's operations was considered and discussed by those present. During the interview the defendant promised, in substance, to secure and indemnify the bank so far as he was able to by the use of any and all the means at his command. At this time mention was made of oil certificates which he had purchased and were then held in hypothecation by other parties, which he afterwards transferred to the bank subject to prior liens. Here, for the first time, reference was made by the defendant to the assistance the Warners would be willing to extend to him in relief of his embarrassments. All of those who were present on this occasion, except the defendant, were sworn as witnesses, and testified as to the use to be made of the Warner notes in case they were procured. The statements made by these witnesses on that subject are substantially alike, and it is unnecessary to repeat in this connection in full the evidence of each.

Mr. Ross, one of the directors, says: "And it was then discussed what should be done, and he (the defendant) was asked what he had in the way of security to secure the bank for this indebtedness; he was asked in regard to the property he had, and said, in the first place, that he was to have $50,000 in notes from Mr. Warner, which would go to replace this indebtedness, and that all the other various property he had, naming his residence and some iron stock and real estate, . . . to make good his indebtedness to the bank." On the subject of carrying the indebtedness the witness said:

"The substance of it was that the indebtedness was to be carried along, if possible, in the bank for the present, until he could sell his oil and get in money and pay it back, and that was the idea." On the same subject Mr. Barnard, the cashier, says: "Something had been said on the subject of carrying the indebtedness of Mr. Upton by the bank. Colonel Parsons was there, and Perkins, Ross, Upton and myself; I remember what Mr. Parsons said, the only salvation for the bank was a rise in oil, I think that was generally assented to, and that, of course, the oil would have to be carried for a while perhaps, and that it should be so carried, if a possible thing; the question of

what property Upton had was gone over, and he stated that Warner would give him some money to assist him in carrying the oil; fifty thousand dollars, I think, Mr. Warner would give him; he inventoried his property, and they asked him if he would execute papers to put it entirely in the hands of the bank, and he said the oil was in the hands of the bank, and he would do anything they asked him to do; he said he would execute any papers required; Parsons and Ross assured Upton that they would not sacrifice him." The next day, the 27th, the Warner notes were procured, aggregating the sum of twenty-five thousand dollars, and were handed into the bank by Mr. Upton, and the cashier, in stating the arrangement and use to be made of the notes, says: "I recollect the receipt by me of the Warner notes from Upton; that was November 27th; about the application of those notes, he said: 'Here are those notes I have got from Warner and I think that will enable me to carry the oil through.' He said he would use the amount of it for that purpose, and I said that I thought it would do it; he handed them to me at that conversation; when he said the notes would be used for that purpose, I think I said 'all right, we will use them for that purpose'; recollect the matter of the protested drafts from Boston that had been drawn before the Warner notes had been received; I knew nothing about the receipt of the Warner notes at the time of the drawing of the drafts." (That draft was drawn in the ordinary course of the business of the bank, and was dated November 25, 1881, signed by the cashier, and addressed to A. Lawrence, Potter & Co., of Boston, for the sum of twenty thousand dollars, payable to the order of D. Clark, cashier of the American Exchange Bank). "I know of the sending off of the Warner notes to Lawrence, Potter & Co.; I started to send them off myself, and the time was short and I asked Mr. Upton to send them; the Warner notes were not sent off for any special purpose, except to the general credit of the bank with Lawrence, Potter & Co.; the sending of the notes on the 27th had nothing to do with that particular draft which came into difficulty and was dishonored on the 28th; that is, if these notes had not come in we

should have sent something else; we did not send those Warner notes to meet this draft; we drew the draft on the 25th of November."

From this evidence, in connection with the other facts and circumstances in the case, we are unhesitatingly of the opinion that it was a question of fact for the jury to pass upon, whether or not the defendant's account should be credited with the avails of these notes as of the 27th of November. It was not made to appear with entire certainty that the avails of the notes were used and applied upon any particular item of indebtedness owing by the defendant. He was not credited with the proceeds in any account, so far as we can discover after a careful examination of the evidence. It is true the Boston house may have used the notes as an indemnity on account of their acceptance and payment of the draft upon it for the sum of twenty thousand dollars, drawn by the City Bank, but that circumstance would not establish the fact that the avails of the note went to pay the defendant's debt, as it was a question in controversy whether the avails of the draft was applied to the defendant's use. If it is true, as the people contend, that the defendant's account was overdrawn on the 27th, then, by a credit in his account with proceeds of the notes, it would be an application of the same on the defendant's indebtedness to the bank, and would be carrying out the arrangement as contended for by the prosecution.

After the court had instructed the jury that the defendant was not entitled to a credit in his account for the proceeds of these notes, the defendant's counsel asked the court to instruct the jury as follows: "If the jury should find that the defendant in no way received the proceeds of the Warner notes from the City Bank, except as he receives them by the cashed checks which he drew and which were debited to him in the account, then they must give him credit on account of the Warner notes." This being refused by the court, the further proposition was presented: "That if the jury should find the City Bank received for its own use in the ordinary course of business the proceeds of the Warner notes (twenty-five thousand dollars), and that sum was not applied in any manner, then or

afterwards, to the use of Mr. Upton, then he was entitled to credit for the proceeds of the Warner notes upon the deposit account," which request was also refused.

By the charge as made and the refusal to charge as here requested, the jury were prohibited from allowing the defendant a credit in his account for the proceeds of the notes, and were not permitted to pass upon the question as to his arrangement actually made with the other officers of the bank, previous to receiving the Warner notes, nor as to the use made of the proceeds at the time they were turned over to the bank. When the trial court assumed to decide the question whether or not the defendant was entitled to a credit for the proceeds of the notes, we think it usurped the province of the jury, and gave a construction to the evidence susceptible of a different interpretation and which it was the exclusive right of the jury to determine.

On the trial of a citizen charged by indictment with a violation of the criminal law, the court cannot instruct the jury as to the verdict they shall render; they are the sole judges of the question of his guilt or innocence. It is equally beyond the province of the court to decide as to the truth or falsity on any pertinent question of fact, raised on the trial, which the evidence tends to prove, however strong and convincing it may appear to be to the mind of the court, in support of either side of the question. If there is no real conflict in the evidence there remains the question of credibility of the witnesses upon which the jury must pass. In the case now before us, the court determined the fact that the proceeds of the Warner notes were applied on the defendant's indebtedness to the bank other than his indebtedness as it appeared on the books of the bank the day those notes were received and accepted by the bank. The question how the avails of the notes should be applied, depended on the evidence of witnesses called by the prosecution, some of whom must have felt that the defendant by his misconduct in management of the affairs of the bank had greatly wronged and injured them personally. It is very natural to suppose that they testified with some ill-feeling towards the accused. Their evidence on this subject consisted

chiefly in a narrative of the oral statements and representations made to them by the defendant before and at the time the Warner notes were delivered over to the bank for its use.

It is the true theory and fundamental principle of the common law, in the trial of criminal cases, for the court to adjudicate upon all questions of law, and for the jury to adjudicate upon all questions of fact. (Commonwealth *v.* Anthes, 5 *Gray*, 185; Duffy *v.* People, 26 *N. Y.* 588; McKenna *v.* People, 81 *Id.* 360; People *v.* Howell, 5 *Hun,* .620; S. C., 69 *N. Y.* 607.)

In Bushnell's case (*Vaughan,* 135) it was very pertinently and forcibly said: "For if the judge, from the evidence, shall . by his judgment first resolve upon any trial what the fact is, and so knowing the fact, shall then resolve what the law is, and order the jury penally to find accordingly, what either necessary or convenient use can be fancied of juries, or to continue trials by them at.all."

The citation of authorities no less direct than pertinent might be indefinitely multiplied. This ancient maxim of the common law, never difficult to comprehend or to apply, has recently been made the subject of legislative declaration, and it is now provided in sections 419 and 420 of the Code of Criminal Procedure that on the trial of an indictment all questions of fact are to be decided by the jury, and the court must, if requested by the defendant, specially "inform the jury that they are the exclusive judges of all questions of fact."

Many of the other rulings made on the trial were excepted to and argued on this appeal, but we do not deem it necessary to consider any of them except those which bring up questions bearing upon the form and sufficiency of the indictment.

It was claimed that it was error to require the defendant to go to trial on the separate counts, and permitting a verdict of conviction to be rendered on more than one of them, as it is not permissible to charge more than one separate and distinct crime in the indictment.

We think the defendant waived the objection now made by appearing and entering a plea of not guilty. This plea was made on the 12th of June, 1883, the day on which the defendant was arraigned in the Oyer and Terminer; on the 9th of

July, the day the trial began, upon the defendant's own affidavit, and those of his counsel, seeking to excuse the omission on their part, in not demurring to the indictment, on the ground that more than one offense was charged therein, the defendant asked the leave of the court to withdraw his plea of not guilty and for permission to interpose a demurrer, which application was denied. It was within the discretion of the trial court to grant or withhold that favor, and, after judgment on a verdict of conviction, this court has no power to review this exercise of discretion vested in the Oyer and Terminer. The indictment was subject to the objection that it charged more than one offense, in violation of the prohibition contained in section 278, and for that reason was demurrable (§ 323, subd. 3). The objection of misjoinder can only be taken by demurrer, and cannot be raised on the trial or on a motion in arrest of judgment (§§ 331, 464). The provisions on this subject are imperative and cannot be disregarded by the court. Prior to the Code, the joinder of several distinct misdemeanors in one indictment was not a cause for a reversal of a judgment where the sentence was single, and was appropriate to either of the counts upon which the conviction was held. People *ex rel.* Tweed *v.* Liscomb, 60 *N. Y.* 559 ; Polinsky *v.* People, 73 *Id.* 65.

The judgment pronounced on the conviction in this case was no greater than could have been given by the court for one offense. *Penal Code*, § 15. By omitting to object to the misjoinder at the time and in the manner provided by the statute, the defendant must be regarded as consenting to be put upon his trial for the several offenses charged in the indictment, and to have the question of his guilt on all of the counts disposed of on one trial and by one jury. We cannot see how the defendant has been prejudiced or how he can be on another trial by investigating the several charges together.

An objection is made also to the sufficiency of the indictment, because of its uncertainty arising from the alleged insufficiency in the description of the property obtained from the bank by means of the overdraft as charged in the several counts. The property is described therein as "the money, notes, drafts and funds of the bank," and the identity of the

things taken is not aided by any other description contained in the indictment. The offense as defined by the statute is predicated upon an overdraft whereby an officer of a bank wrongsully obtains "the money, notes or funds of the bank." We are of the opinion that, in this particular, the indictment would be adjudged bad if tested by the common-law rule of pleading as it existed prior to the adoption of the Criminal Code. We are also of the opinion that, tested by the statutory rule as it now exists, it would be adjudged bad if timely objections had been interposed by demurrer. In the system of procedure now in force in criminal cases, all technical questions and formal defects appearing upon the face of the indictment must be taken by demurrer, and cannot be raised on the trial or on a motion in arrest of judgment; and the only questions which can be presented after conviction are for cause affecting the jurisdiction of the court, or that the facts stated do not constitute a crime (§§ 323, 331). In each of the counts the facts stated do not constitute a crime. The objection now under consideration relates to the sufficiency of the description of the personal property charged to have been appropriated by the defendant to his own use. The charge is positive that the defendant did obtain money, notes, drafts and funds belonging to the bank. In this State demurrers in criminal cases have seldom occurred, because prior to the Code the defendant might have taken advantage of the defects of the trial, or on a motion in arrest of judgment with the same effect as he could upon a demurrer. The manifest purpose of the statute was to require formal objections to be taken, before putting the people to the expense of a trial on the facts, and not to embarrass or take away from the defendant the right to obtain the opinion of the court upon the sufficiency of the indictment, but requiring him to present the questions intended to be presented by demurrer.

In Massachusetts the same rule of practice prevails, based upon a statute which provides that objections to an indictment for formal defects, apparent upon its face, shall be taken by demurrer, or on motion to quash before trial, and not by motion in arrest of judgment, unless for a cause affecting the jurisdiction of the court. *Statutes Mass.* 1864, chap. 250, §§ 2, 3.

Under this statute it has been held that an indictment for larceny cannot be objected to for informality in the description of the goods stolen after trial commenced. Commonwealth *v.* O'Connell, 12 *Allen*, 451. In that case it was charged that the defendant, on a day and place named, did steal and carry away "a quantity of bank bills current within this commonwealth, amounting together to one hundred and fifty dollars, and of the value of one hundred and fifty dollars," and it was held that as the objection was not raised before the jury were empannelled the defendant was not entitled to the benefit of any formal or technical defect in the mode of the allegation or description of the property.

Under the same statute it has been held that an indictment for stealing goods, which does not aver that they were taken and carried away, is a formal defect only, and cannot first be raised on a motion in arrest of judgment. Green *v.* Commonwealth, 111 *Mass.* 417; see, also, as bearing on the same subject, Commonwealth *v.* Legassy, 113 *Id.* 10; Commonwealth *v.* McGovern, 10 *Allen*, 193.

The indictment here does not set forth the value of the property acquired by the defendant by means of the overdraft. Such an averment is necessary to constitute a perfect pleading, and is usually inserted in indictments charging offenses of this character. The omission to make the proper averment may be taken advantage of by the defendant at the time and in the manner provided by the statute. The neglect to do so constitutes a waiver under the present system of procedure. The defect thus pointed out is, as we think, of a formal character, as the statutory offense is not made to depend on the value of the money, notes or funds wrongfully acquired by the defendant by means of an overdraft; nor does the degree of punishment imposed by the statute depend upon the extent of loss suffered by the bank.

The act charged in the indictment constitutes a crime, and is stated with sufficient certainty so as to enable the court to pronounce judgment upon a conviction, according to the right of the case, and it should therefore be maintained. *Code Crim. Pro.* § 284, subd. 7.

The judgment reversed, new trial awarded upon the indictment, and the proceedings are remitted to the Oyer and Terminer of Monroe county, with directions to proceed thereon according to law.

SMITH, P. J., HAIGHT and BRADLEY, JJ., concur.